UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
                                     :

SHERRY E. BENDER,

                Plaintiff,

     -v.-

ARIEL DEL VALLE, et al.,

              Defendants.

----------------------------------------------------------------x

05 Civ. 6459 (GEL)

**OPINION AND ORDER**

Sherry E. Bender, pro se.

Lev Dassin, Acting United States Attorney for the
Southern District of New York (Brian M. Feldman,
Assistant United States Attorney, of Counsel), New
York, NY,  for defendants Steven Beskey, Richard
Matos and Carlos Ortiz.

Michael A. Cardozo, Corporation Counsel for the
City of New York (Bradford Patrick and Raju
Sundaran, Assistant Corporation Counsel, of
Counsel), New York, NY, for defendant the City of
New York.

Laurine M. Rubin, (Bonnie Porzio, of Counsel),
Rivkin Radler LLP, Uniondale, NY, for defendant
Ariel Del Valle.

GERARD E. LYNCH, District Judge:

       In this long-running pro se action, plaintiff Sherry Bender sues a number of defendants,

alleging various causes of action arising out of her arrest following an altercation at a Social

Security Administration service center in New York.  This Court, both through the undersigned

judge and through the Honorable Ronald L. Ellis, United States Magistrate Judge, has resolved

numerous motions during the course of this litigation.[1]

By letter dated December 30, 2008, shortly after Judge Ellis completed the pre-trial proceedings in the case and returned the matter to this Court for trial or other disposition, the Government advised the Court that Bender had been found incompetent to stand trial on misdemeanor criminal charges by the Honorable James Gibbons of the New York City Criminal Court.[2] The Government suggested that this Court address whether Bender is competent to proceed to trial in connection with the instant matter. At a conference with Bender and counsel for all defendants on January 6, 2009, it was agreed that the Court would review the record of this case and of the state court criminal matter, and the various expert reports that had been submitted in connection with these litigations, and either address the competency issues on the existing record, or, if necessary, conduct an evidentiary hearing. Having thoroughly reviewed the voluminous record, carefully considered the conclusions of Judge Gibbons, and reflected on the Court's own interactions with the plaintiff throughout the course of this litigation, the Court concludes that Bender is competent to represent herself in this matter, and that it is neither necessary nor appropriate to appoint a guardian ad litem to defend her interests.

---

[1] See Bender v. Del Valle, No. 05 Civ. 6459, 2008 WL 4900560 (S.D.N.Y. Nov. 14, 2008); Bender v. Gen. Servs. Admin., 539 F. Supp. 2d 702 (S.D.N.Y. 2008); Bender v. Del Valle, No. 05 Civ. 6459, 2007 WL 2584933 (S.D.N.Y. Sept. 7, 2007); Bender v. Del Valle, No. 05 Civ. 6459, 2007 WL 1827839 (S.D.N.Y. June 25, 2007); Bender v. Del Valle, No. 05 Civ. 6459, 2007 WL 1686322 (S.D.N.Y. June 6, 2007); Bender v. Del Valle, No. 05 Civ. 6459, 2007 WL 528694 (S.D.N.Y. Feb. 20, 2007); Bender v. Del Valle, No. 05 Civ. 6459, 2007 WL 313464 (S.D.N.Y. Jan. 31, 2007); Bender v. Del Valle, No. 05 Civ. 6459, 2006 WL 3833436 (S.D.N.Y. Dec. 22, 2006); Bender v. Gen. Servs. Admin., No. 05 Civ. 6459, 2006 WL 1643345 (S.D.N.Y. June 9, 2006); Bender v. Gen. Servs. Admin., No. 05 Civ. 6459, 2006 WL 988241 (S.D.N.Y. Apr. 14, 2006).

[2] The misdemeanor criminal charges are related to Bender's attempt to shut down a noisy bar that opened near her apartment, and which she contends is operating illegally. They are unrelated to the incident at issue in this case.

2

## I.    Legal Standards

Rule 17(c)(2) of the Federal Rules of Civil Procedure provides that a court "must appoint a guardian ad litem – or issue another appropriate order – to protect a minor or incompetent person who is unrepresented in an action." Conducting litigation is a strenuous task for a non-lawyer in the best of circumstances, and the rule's mandate reflects the obvious importance of taking steps to insure that the rights of a person who is not competent to handle his or her own affairs are fully protected in litigation. At the same time, however, "a litigant possesses liberty interests in avoiding the stigma of being found incompetent, see Wisconsin v. Constantineau, 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971), and in retaining personal control over the litigation." Neilson v. Colgate-Palmolive Co., 199 F.3d 642, 651 (2d Cir. 1999). Care must therefore be taken, not only to protect those who are not capable of protecting their own interests, but also to preserve the liberty interests of those who are able to do so and who desire to maintain control of their own legal affairs.

This balance is especially important in the case of pro se litigants, who may well make decisions that to a trained lawyer may appear ill-advised, and who may, sometimes, appear obsessed or conduct themselves in an unconventional manner. Merely acting unconventionally, however, does not demonstrate incompetence. "Parties to litigation behave in a great variety of ways that might be thought to suggest some degree of mental instability. Certainly the rule contemplates by 'incompetence' something other than mere foolishness or improvidence, garden-variety or even egregious mendacity, or even various forms of the more common personality disorders." Hudnall v. Sellner, 800 F.2d 377, 385 (4th Cir. 1986), cited with approval in Ferrelli v. River Manor Health Care Center, 323 F.3d 196, 201 (2d Cir. 2003). However, where a court is "presented with evidence from an appropriate court of record or a

3

relevant public agency indicating that the party had been adjudicated incompetent," Ferrelli, 323

F.3d at 201, an inquiry is appropriate.

The parties have not cited, and the Court has not found, Second Circuit case law clearly

delineating the applicable standard for determining when a civil litigant who has not been

adjudicated generally incompetent requires intervention under Rule 17(c). The Fourth Circuit,

however, has sensibly observed that

> [w]hat the rule undoubtedly contemplates is that form of mental
> deficiency which – whether or not accompanied by other forms of
> personality disorder – affects the person's practical ability to
> manage his or her own affairs. This is the general test applied by
> the civil law for making adjudications of "incompetency" for a
> variety of purposes.

Hudnall, 800 F.2d at 385 (internal quotations omitted). As the Fourth Circuit observed, in a

portion of its opinion that has been quoted approvingly by the Second Circuit, "[i]n common

experience, there is of course no necessary relationship between 'mental incompetence' in this

special sense and various forms of mental derangement or personality disorder that may cause

utterly bizarre and destructive conduct in litigation as in other realms." Id., quoted in substantial

part in Ferrelli, 323 F.3d at 203. District courts in this circuit have looked for guidance as well

to New York State law, under which a guardian may be appointed for a litigant who is

"incapable of prosecuting or defending his rights." N.Y. C.P.L.R. 1201. E.g., Makas v.

Holonchock, No. 9:02-cv-00836-JKS, 2007 WL 1651830, at *4 (N.D.N.Y. June 7, 2007);

Bowen v. Rubin, 213 F. Supp. 2d 220, 223 (E.D.N.Y. 2001).

## II.    The Evidentiary Record

In an effort to apply these standards, the Court has looked to the reports of a large

number of expert mental health professionals who have evaluated Bender for various reasons

4

over approximately the last two years in the course of this or the criminal litigation. While all of these professionals agree that Bender suffers from some form of mental illness, their specific diagnoses vary, as do their assessments of the severity of the illness and of the extent to which Bender is impaired. Although many of these evaluations were conducted for litigation purposes, not all of them directly address the question of competency to stand trial or to prosecute litigation.

The Court has reviewed the reports of Dr. Jason Hershberger, dated June 29, 2007, which addressed whether Bender was mentally ill at the time of the incident at issue in this case; Drs. Ankur Saraiya and Jennifer Rosner, dated May 7, 2008, and May 8, 2008, respectively, prepared in connection with the criminal litigation for the purpose of determining her competence to stand trial; Drs. N.G. Berrill and Alberto Goldwasser, dated August 12, 2008, prepared for the same purpose; and Drs. Isabella Kanellopoulou and Marta Scott, prepared on December 15, 2008, after the dismissal of the criminal charges. The Court has also reviewed the transcripts of proceedings in the Criminal Court on various dates between September 2 and December 15, 2008, including testimony of Drs. Rosner, Saraiya, and Goldwasser, as well as colloquy between Bender and the Criminal Court and the opinion of Judge Gibbons. Finally, the Court has considered the voluminous submissions from Bender herself, reviewed the record of the instant matter, and reflected on its own experienced with the plaintiff.

### A.    Expert Evaluations

Dr. Hershberger, a forensic psychiatrist, was selected by the Government to examine Bender in connection with the discovery process in this case. In addition to examining Bender, he reviewed records relating to this case (and apparently to certain other civil actions filed by Bender), including transcripts of proceedings and the medical records of Beth Israel Hospital, to

which Bender was taken following the 2002 incident that is the subject of this case. He also

reviewed records of a 1994 psychologist's report finding that Bender suffered from Post-

Traumatic Stress Disorder as a result of an arrest (apparently a rather cursory opinion submitted

in aid of a lawsuit brought by Bender); records of a medical emergency room visit in 2000 in

which Bender's behavior led to a psychiatric consultation and the suggestion of a "somatic

delusion" and "probabl[e] personality disorder"; a 2001 report from a social worker, submitted

in connection with Bender's application for social security disability benefits, diagnosing major

depressive disorder; and a 2001 psychiatrist's evaluation (possibly also in connection with

Bender's social security application) that considered a number of diagnoses, while reporting "no

gross thought disorder, no delusions, [and] no paranoid trends."

        Dr. Hershberger additionally reviewed the report of psychologist Ann Winton, who

interviewed Bender in connection with the present action, apparently as a potential expert

witness for plaintiff on non-competency-related matters.[3]   Based solely on several interviews

with Bender – in which Dr. Winton found that Bender was coherent, articulate, logical and

legally knowledgeable, although "somewhat prone to misunderstanding" and "easily upset"

when she was not understood, and exhibited a wide range of facial and emotional expressions –

Dr. Hershberger relays Dr. Winton's conclusion that Bender did not have a delusional disorder,

but did suffer from Post-Traumatic Stress Disorder as a result of the incident at issue in this case.

This conclusion is, of course, consistent with her intended role as a plaintiff's expert: she finds

Bender essentially normal, except to the extent that she suffers from symptoms that result from

the alleged misconduct of defendants in this case.

_____

        [3]   This report was not provided to the Court in connection with the present competency
review.

Dr. Hershberger's report also provided excerpts from the Beth Israel Hospital records reflecting diagnoses of "Adjustment Disorder with Disturbance of Conduct" and "Bipolar disorder, Manic episode." He further notes that in March 2006, Bender was twice taken to Bellevue Hospital by the police. On the first occasion, she was released the next day with a diagnosis of Paranoid Delusional Disorder, but without any apparent treatment or prescription; on the second, she was similarly released after one night, this time without a definitive diagnosis. Finally, from among the materials he reviewed, Dr. Hershberger describes an impressive array of correspondence reflecting hostile relations between Bender and a number of medical and dental care providers with whom she came into conflict, often loud and abusive on Bender's part, from 1999 to 2001 and in 2006, regarding her care.

In his interview with Bender, Dr. Hershberger found her "relaxed and at ease," with an "affect . . . within the normal range." "She was alert, oriented and sharp," and denied all manner of psychiatric symptoms and disorders. She was able to distinguish her difficulties with the police regarding the neighboring bar from the incident at the Social Security office that is the subject of the present case, and did not see the incidents as linked parts of some conspiratorial system. Dr. Hershberger rejected a diagnosis of Post-Traumatic Stress Disorder, and found her to be suffering from a longstanding "Borderline Personality Disorder," characterized by "an explosive and socially inappropriate response to interpersonal conflict." Dr. Hershberger's conclusions are consistent with his anticipated role as a defense expert in a civil case: he finds that any mental abnormality exhibited by Bender is a pre-existing condition and not the result of any mistreatment by defendants, and that her psychiatric disorder is consistent with the defense account of her behavior in the incident sub judice. He does not address her competence to proceed, but nothing in his report – other than the reported history of an alarming temper – casts

7

any doubt on her fundamental sanity and ability to understand her situation.

Dr. Saraiya, a psychiatrist, and Dr. Rosner, a clinical psychologist, jointly interviewed Bender upon the order of examination issued by the state Criminal Court, pursuant to Article 730 of the New York Criminal Procedure Law, to assess her competency. Both diagnose her as suffering from a Paranoid Personality Disorder and unfit to stand trial. Dr. Saraiya's report includes the results of a colloquy regarding Bender's understanding of the nature of the criminal case and the participants in it, in which Bender accurately identifies her attorney, and correctly describes his function as defense attorney, as well as the respective roles of the judge, jury, and prosecutor, and the consequences of conviction and acquittal. Dr. Saraiya describes a generally coherent interview in which Bender described her educational background, medical and psychiatric history, and previous arrests. The results of the mental status exam include the observations that she was cooperative and maintained eye contact, was oriented as to time and place, and appeared to be in the high average range of intelligence.

However, Dr. Saraiya also reported her affect as "reactive and overly dramatic, quite labile." The basis for his ultimate conclusion that Bender "lack[ed] the capacity to understand the proceedings against him/her or to assist in his/her own defense" (obviously a rote recitation, given the pronoun use) is not really specified, and is difficult to understand. Other than her emotional lability, and an expressed concern that Drs. Saraiya and Rosner would have her incarcerated[4] (when, in fact, Dr. Saraiya reports that it was made clear to Bender that she was free to leave the interview at any point), the only potentially abnormal ideation reported by Dr.

---

[4] Bender did not state this concern during the interview. Drs. Saraiya and Rosner learned of this concern from a letter from Judge Gibbons, indicating that Bender had expressed this fear in Court.

8

Saraiya is her insistence "that the charges [against her] are false and that she is the victim of harassment at the hands of the bar owners, the local police, an upstairs neighbor, and her superintendent."

Dr. Rosner's report reaches the same formulaic conclusion, and the same diagnosis. Her report is longer than Dr. Sarayia's, and lists additional materials that were reviewed in reaching her opinion. Dr. Rosner reports an interview almost four hours in length, "which is extremely long, due to difficulty obtaining information" from Bender, whose statements are reported to be "overinclusive and unnecessarily detailed," as she is "unable to be more concise when asked to do so." Bender is also reported to be "labile," "quickly fluctuat[ing] between calmness, cheerfulness, anger and tearfulness." On the other hand, she is described as "alert, oriented, and grossly intact cognitively," and "bright, articulate, and knowledgeable about the factual details of her current legal predicament," as well as "well groomed and neatly dressed." Once again, the principal feature identifying Bender as paranoid (according to Dr. Rosner) is her insistence that she is the victim, and her description of the police and others as "vindictively and maliciously harassing" her. Unlike Dr. Saraiya, Dr. Rosner explicitly connects her observations to her ultimate conclusion of incompetence to stand trial: despite being "knowledgeable about the factual details of her current legal predicament," Bender "fails to appreciate her role as the defendant, rather than the victim," and "does not realistically consider the possible outcomes of her case." These "paranoid fixations . . . impede her capacity to work effectively with an attorney in her own defense."

At Bender's request, the state court agreed to assign Dr. N.G. Berrill, a forensic psychologist, as a defense expert to assess Bender's competency. Dr. Berrill evaluated Bender in July and August 2008, and found her competent to stand trial. In so finding, Dr. Berrill notes

9

that she "demonstrates an adequate, if not excellent, understanding of courtroom procedure," and finds "no evidence of major . . . psychopathology." According to Dr. Berrill, that Bender "can be somewhat tangential[] at times" in relating the facts of the case, and can become "quite emotional" when describing her various encounters with the authorities is not evidence that "she is suffering from a psychotic disorder." Although finding her competent, Dr. Berrill diagnoses Bender as suffering from "Adjustment Disorder, N[ot] O[therwise] S[pecified] with Anxious Features," and "obsessive-compulsive, histrionic and narcissistic personality features." In short, Drs. Saraiya and Rosner, assessing Bender's competence after a referral from a Criminal Court judge, found her incompetent, while Dr. Berrill, anticipating a role as a defense expert, found Bender competent to stand trial.

Dr. Goldwasser, a forensic psychiatrist and neurologist, was originally retained by Bender to evaluate her treatment at Bellevue Hospital (apparently with a view to litigation). Later, his report was expanded, at Bender's request, to address the issue of her competence to stand trial in the criminal case. Dr. Goldwasser found Bender competent. His report is much longer than the other doctors' reports addressing competency, incorporating more detail from records of previous psychiatric contacts, and responding directly to the findings of Drs. Saraiya and Rosner. He also has spent much more time with Bender than the other evaluating professionals. Dr. Goldwasser notes that when Bender was taken to Beth Israel in 2002, she was not found to have a major psychiatric illness, and was released without receiving any treatment or any prescription. Similarly, when taken by the police to Bellevue after making "incessant" calls to 911 and 311 to complain about her neighbors, Bender was initially diagnosed, based largely on the police report, as suffering from a "psychosis not otherwise specified." She was, however, assessed to pose no risk of violence, and was discharged the following day with a

10

diagnosis of "Paranoid Delusional Disorder" based largely on her reports of a police conspiracy against her. A similar result occurred from a similar incident the following week. In September 2006, the police brought her first to Bellevue, and then to another hospital, each of which found her not in need of hospitalization.

Dr. Goldwasser rejects the conclusions of Drs. Saraiya and Rosner, finding them unreliable in part due to inconsistencies in their reports of a jointly-conducted interview, and in part due to disagreement with their medical analysis. He notes that paranoia is "a psychotic process characterized by the false firm belief that others want to hurt the person," and observes that the conclusion that Bender suffers from some form of paranoia rests on an assumption about the merits of her complaints.[5]

Dr. Goldwasser's own interview findings are similar to those of the court-appointed doctors in noting Bender's accurate descriptions of the nature of the criminal process in which she was involved. He offers no clinical diagnosis, but concludes that Bender is competent to stand trial, and finds her "an intelligent, sensitive and artistic woman" who "relates in a vigorous and energetic manner." While she "expresses herself in a fervent and even exaggerated verbal style," he regards her use of words like "kidnaping" and "torture" to refer to aspects of her

---

[5] While Dr. Goldwasser faults Drs. Saraiya and Rosner for assuming that Bender's complaints are delusional, and accurately notes that "[t]he veracity of Ms. Bender's position is to be determined by the trier of fact," he too on occasion makes assumptions about the accuracy of what she told him – in his case, accepting rather than rejecting her reports. Thus, in criticizing Dr. Rosner for referring to the bar of which Bender complained to the police as, alternatively a "nearby bar" or a "neighborhood bar," Dr. Goldwasser states flatly that "it is not a 'nearby bar'" and "[i]n fact, it is not a neighborhood bar, but a bar who [sic] shares a wall with her small apartment, and is the subject [of] all of Ms. Bender's strife." Wholly apart from the peculiarity of objecting to the description of a next-door bar as "nearby," Dr. Goldwasser appears to have reached his own legal conclusion, based on unspecified materials presented to him by Bender without adversarial testing, that there were indeed "irregularities" in the zoning and approval of the bar.

11

interactions with others as mere verbal overkill, rather than as evidence of any mental illness. Thus, Dr. Goldwasser, retained by Bender, supports her position that she is competent.

Finally, upon Judge Gibbons's conclusion that Bender was not fit to proceed in the criminal matter, she was referred, pursuant to Article 730 of the New York Criminal Procedure Law, to the custody of the Commissioner of the Office of Mental Health, whereupon she was taken to the Manhattan Psychiatric Center on Ward's Island for observation and treatment as the commissioner thought appropriate. It was, of course, not the function of the examining doctors at the Psychiatric Center to second-guess the court's competency determination. Nevertheless, it is difficult to read the brief report of the examining psychiatrists, Drs. Kanellopoulou and Scott, without concluding that they were somewhat puzzled to find Bender referred to them under these circumstances. They describe her as "a very articulate, elegantly dressed and cooperative middle aged female," and report in their medical findings almost nothing at all in any way suggestive of any mental illness. They note her "good eye contact," and the absence of any "psychomotor retardation or agitation, . . . abnormal movements, tics or tremors." The doctors found her "pleasant, alert and oriented," with a "full range [and] appropriate" affect, and "above average" intelligence. Although they elicited no evidence of "delusions" or hallucinations, they noted that Bender was "preoccup[ied] with the events related to the 'illegal bar.'" It was apparently this that led them to evaluate her judgment and insight as merely "fair." They diagnosed no major psychopathology, but without further explanation described her as having a "paranoid personality disorder."

Ultimately, Drs. Kanellopoulou and Scott recommended "individual psychotherapy to help [Bender] improve her reality testing and manage interpersonal problems in a more efficient way," and equivocally suggested that she "*may* also benefit from a low dose of antipsychotic

12

medication." (Emphasis added.) Bender was released the same day, with a follow-up outpatient appointment scheduled several weeks later. Drs. Kanellopoulou and Scott, deciding whether Bender was in need of commitment for in-patent mental health treatment, found her not seriously disturbed.

In addition to the expert reports, the Court has also reviewed the in-court testimony in the state court proceedings of Drs. Rosner, Saraiya and Goldwasser. The witnesses testified essentially in accord with their reports.

### B.     Other Evaluations

#### 1.     Judge Gibbons

Apart from the mental health professionals, the Court has the benefit of the observations of many non-medical observers. Most significantly, it has the benefit of Judge Gibbons's careful findings. These findings, set forth on the record in a lengthy oral opinion, are notable for the thoroughness and care with which Judge Gibbons analyzed the record and the proceedings before him. (Tr. 15-95).[6]

Judge Gibbons began by noting that, in the criminal case before him, Bender had initially been represented for approximately a year by an attorney from the Legal Aid Society, and that this attorney had appeared before Judge Gibbons many times competently and effectively. After about a year representing Bender, that lawyer, with the full support of senior staff of the Legal Aid Society, appeared before the court (before a judge other than Judge Gibbons) urgently requesting to be relieved of the representation. The judge hearing that application granted it,

---

[6] "Tr." refers to the transcript of the proceedings in <u>People v. Bender</u>, Dkt. Nos. 2006NY062804, 2007NY068875, 2008NY023051, of December 15, 2008, held in the Criminal Court of the City of New York, County of New York.

after hearing evidence, including a tape recording of a confrontation between Bender and

attorneys of the Legal Aid Society, in which Bender demanded – in a tone of voice the judge

characterized as "deeply troubling" (id. 18) – that the attorneys represent her beyond the scope

of their appointment (including representing her in the instant action), refused to accept their

accurate account of the limitations of their representation, and threatened to damage them

professionally and attack their licenses to practice law if they did not provide broader

representation. (Id. 16-17.)[7] Relieving the Legal Aid Society, the presiding judge promised

Bender to personally select a suitable attorney from the 18-B Panel. The attorney appointed was

characterized by Judge Gibbons as not only an experienced and competent defense attorney, but

as one who "among the spectrum of defense attorneys who appear from the 18-B Panel in this

courtroom, among the very most tolerant, patient, long suffering, and essentially gentle and

sympathetic to the client." (Id. 19.)

Judge Gibbons extensively described his own observations of Bender and the substitute

counsel over the lengthy period of time he had been associated with the case. According to the

court, the relationship between lawyer and client was cordial, and the lawyer represented Bender

vigorously and competently. (Id. 20-22.) Indeed, when in February 2008 an issue arose

regarding the attorney's possible conflict of interest, and the court conducted the state equivalent

of a Curcio hearing, United States v. Curcio, 680 F.2d 881 (2d Cir. 1982), Bender stated that she

wanted the lawyer to continue with the case and that she was satisfied his representation. (Id.

22-23.) Similarly, when the prosecutor a week later raised a question about Bender's

competence to proceed, counsel emphatically defended her competence, stating that his

---

[7] This description is strongly reminiscent of Bender's conflicts with medical personnel
reviewed by Dr. Hershberger.

relationship with her was good, and that she was "cogent, in her right mind, capable of discussing legal and factual issues with him." (Id. 23.)  Although Judge Gibbons initially thought a competency exam unnecessary, on further reflection he opted to order one, deciding that if there was any basis at all for questioning a defendant's competence, it was desirable to obtain expert advice. (Id. 23-26.)

Up to that point, it appears that the proceedings had been relatively uneventful and benign. On April 15, 2008, however, the day after Bender's examination by the court-appointed experts, Bender appeared in Judge Gibbon's courtroom and conducted herself in a manner that transformed the judge's view of the situation. Bender was "extraordinarily distraught," and was "not able to control her facial expressions . . . . [which] would deviate from sobs to what [Judge Gibbons] describe[d] as a rictus, a fixed and completely inappropriate grin, which would then dissolve into sobs again." (Id. 27.)  Bender reported that she feared that the doctors "would forcibly incarcerate her," and indeed had "forcibly detained and incarcerated [her] . . . due to their refusal to let her use the restroom." (Id. 28.)  She added that she came to the court from the office of her lawyer, who had behaved toward her in a "physically threatening and physically aggressive" manner. (Id.)  She refused to leave the courtroom at Judge Gibbon's direction, and when she finally did leave she soon "burst back into the courtroom and continue[d] in [an] almost uncontrollable manner." (Id.)

Judge Gibbons promptly scheduled a proceeding to look into Bender's allegations, with counsel present. After hearing at length from Bender, he concluded that "setting completely to one side her demeanor" at the previous session, the representations she made to the court in that proceeding were "twisted in a way exemplifying a perception that persons were out to get her." (Id. 29.)  He found "no reasonable grounds" for Bender's belief that the competency examiners

15

planned to incarcerate her or had forcibly detained her, or for her belief that the attorney had
been physically threatening.  (Id. 29-30.)

As disturbing as this incident was, Judge Gibbons did not make a premature finding of
incompetence.  Rather, he waited to hear from the mental health examiners, Drs. Saraiya and
Rosner, and upon receiving their reports, ordered a hearing.  Before the hearing could be held,
however, Bender again took matters into her own hands in a way that damaged her position,
writing a letter to the court that Judge Gibbons described as a "remarkable document."  (Id. 35.)
The letter contained a "plethora" of allegations, which a reasonable person would surely regard
as extremely unlikely, of "conspiratorial[ ]" behavior towards Bender on the part of the State
Liquor Authority, the Manhattan and Bronx District Attorneys, and others.  (Id. 36.)  Judge
Gibbons quite reasonably found the letter "broadly consistent with what Drs. Saraiya and Rosner
essentially would have predicted" (id. 37), as well as with Dr. Hershberger's diagnosis of a
personality disorder that would produce "a warped perspective, and warped interaction with the
world" (id. 38-39).  Judge Gibbons noted the "great difficulty" he had experienced in "getting
[Bender] to respond squarely, nondiscursively, and in fact . . . respond at all" to questions.  (Id.
40.)

Also prior to the competency hearing, Bender moved to replace her court-appointed
defense lawyer.  Judge Gibbons noted that the complaints asserted by Bender were "in very large
part, either unpersuasive or misguided on their face" – the sort of complaints that "just looking at
them made manifest to [him] that [Bender] was not coming to grip with what procedurally was
taking place in the case."  (Id. 45.)  Judge Gibbons found that Bender's accusations against
defense counsel (in the initial letter requesting his removal and a subsequent one reiterating and
expanding her charges, see id. 54-55), and against the judge himself, were additional instances

16

"in which an interaction between the defendant and a significant party in her life . . . was twisted in a manner reflective of a simply unjustifiable conclusion of an untowardly adverse set of actions or conclusions taken against her by the other party." (Id. 49.)

Finally, Judge Gibbons recorded his observations of what can only be described as bizarre behavior by Bender in court during the competency hearing, including "aggressively" lunging at, and engaging in "actual physical interference with" her attorney. (Id. 65.)

Ultimately, based on his evaluation of the credibility of the various experts, as well as on his own observations, Judge Gibbons found Bender incompetent to stand trial, noting that while she may well have been able to cope calmly and rationally with less stressful situations, when things went against her in the stressful context of litigation "everything went to hell in a hand basket," and Bender became incapable of dealing rationally with her situation. (Id. 72.)

### 2.   Other Lay Observers

In addition to Judge Gibbons, the record includes additional, and generally more favorable, assessments of Bender's mental status. Her retained criminal attorney, Martin Streit, hired by Bender to replace her court-appointed defense lawyer, advised Judge Gibbons, both by letter and in court during the competency proceedings, that he found Bender competent and collected. (Id. 79.) Bender also submits an impressive collection of testimonials from friends and neighbors, who attest to her superior functioning, and for the most part profess themselves perplexed that anyone would find her incompetent to handle any of her affairs. To cite just a few, Cathy Bell writes that she has "known Bender for many years as a close friend" and believes her to be "bright, informed and perfectly capable of representing her own self-interest." Likewise, Mia Hamel writes that she has known "Bender for over 3 years as fellow members of a political organization" and that Bender "has always been very congenial, intelligent and well

17

informed," and "has received acknowledgment for her contributions within the organization."
Hamel offers that she has observed Bender to be "competent in every way." Bender's neighbor
Kim Clark touts her as "one of the most positive [and] influential" people in her life and that all
of Clark's "personal life experiences with [Bender] conflict with the characteristics" of a
mentally incapacitated person. Similarly, Susan Di Carlo, who has known Bender for almost ten
years, finds it "ludicrous" that the mental capacity of "someone as bright, conscientious,
emotionally solid and decent" as Bender would be called into question. On the other hand,
Judge Gibbons reports that personnel of the clerk's office in the state criminal court had reported
to him an example of "worrisome" behavior by Bender towards them. (Tr. 60-61.)

Even more germane to the present context, Bender has had the experience of handling
pro se civil matters, and bringing them to a satisfactory conclusion. Neither Judge Ellis, who
supervised the pre-trial proceedings, nor the undersigned judge, has noted any of the erratic
behavior observed by Judge Gibbons. Bender has litigated a number of motions in this Court
and before the Magistrate Judge, with some success. E.g., Bender v. Del Valle, No. 05 Civ.
6459, 2008 WL 4900560 (S.D.N.Y. Nov. 14, 2008); Bender v. Del Valle, No. 05 Civ. 6459,
2007 WL 1827839 (S.D.N.Y. June 25, 2007). Her papers and oral presentations, while perhaps
overelaborate or (as Judge Gibbons characterized them) "discursive[ ]," are generally well
constructed.

### III.    Summary and Conclusions

It cannot be doubted that the record before the Court is sufficient to raise a significant
concern about Bender's ability to proceed effectively in representing her own interests. As
Judge Gibbons noted, her behavior in his court corroborates the conclusions of Drs. Hershberger,
Rosner and Saraiya that Bender suffers from a mental disorder of some type, which predisposes

18

her to what is called paranoia in ordinary English (if not in the more precise terminology of psychological diagnostics). Most troublesome of all is Judge Gibbons's well-supported conclusion that this disorder manifests itself most strongly under stress, because that observation tends to explain and undercut the observations of so many who have interacted with Bender (including her friends and acquaintances, her own attorney and retained expert, and the undersigned judge), who have found her intelligent and able.

But if this evidence demonstrates that Bender suffers from mental illness, the medical and other evidence offers no conclusive understanding of the nature and degree of that illness. Some mental health practitioners find her seriously disturbed; others find no evidence of significant pathology. She has been diagnosed by various medical doctors and psychologists with Post-Traumatic Stress Disorder, somatic delusions, personality disorder, depression, adjustment disorder, bipolar disorder, paranoia, borderline personality, and unspecified psychosis. These diagnoses are for the most part inconsistent, and one or another expert has at one time or another ruled out virtually all of these diagnoses.

While the experts who have opined on the subject differ as to her competence to stand trial on criminal charges, all agree that she has an intellectual understanding of the nature of the proceedings and the roles of the participants. The principal question raised about this understanding centers on her insistence that she is a victim, hardly an unusual or disqualifying feeling o the part of a criminal defendant.[8] Judge Gibbons accepted the opinions of Drs. Saraiya and Rosner in large part because of Bender's erratic and unacceptable behavior in his courtroom,

---

[8] Indeed, it seems clear that Bender's profession of victim status represents not a misunderstanding or delusion about her role in the case, but simply a rhetorical assertion of a position on the merits, and in fact one not infrequently made by defendants and even by their lawyers.

which suggests an inability to control herself under the stress of criminal proceedings.

In civil proceedings, however, the ample evidence from Bender's submissions that she has an intellectual understanding of the nature of the proceedings – fully documented by her pro se briefing of a variety of issues – has not been contradicted or called into question by her behavior.  In previous matters, she has apparently brought civil proceedings on her own behalf to successful settlement.  More importantly, she has won motions in this proceeding, submitting papers no more rambling or discursive, and sometimes even more persuasive, than is typical of pro se civil litigants.  Neither the undersigned judge nor the experienced Magistrate Judge who has handled the pretrial preparation of the case has found Bender beyond the range of difficulty often experienced with pro se litigants, or had any occasion internal to this matter to call her basic sanity or competence into question.

This Court has no reason to question Judge Gibbons's ruling with respect to the matter before him.  In a criminal case, the consequences of conviction are drastic, and the risk to a defendant who is not capable of rationally weighing alternative courses of action are severe.  While a criminal defendant may prefer (as Bender evidently does) to proceed with the case in an effort to achieve the vindication of acquittal and to avoid any reputational consequence of being declared incompetent, the ultimate consequence of the court's finding of incompetence is not necessarily adverse to the defendant.  In this instance, for example, the result of Judge Gibbon's finding was that the criminal charges were dropped and Bender was promptly examined by mental health professionals, found not subject to civil commitment, and released.

The matter stands differently in a civil litigation.  The stakes in a civil proceeding, particularly for a plaintiff, are much lower than those facing a criminal defendant.  Indeed, Judge Gibbons's finding was predicated, at least in part, on his determination that it was precisely the

20

stress of the *criminal* proceeding that rendered Bender incompetent. Rejecting Bender's argument that the fact that she "has done well in civil litigation" demonstrated her competence to proceed in the criminal matter, the judge noted that he did not doubt the premise, but that he did "not find commensurate in any way the degree of pressure and difficulty which would be encountered . . . in a civil litigation, as compared to [being] called upon to come into court and defend against criminal charges." (Tr. 83-84.) In the instant litigation, Bender is the plaintiff, seeking recompense for injuries allegedly done to her by defendants. Her liberty is not at risk, nor is she in danger of suffering the stigma of a criminal conviction. The worst that can happen to her is that she will not succeed in proving her case. To date, in this litigation, Bender has not exhibited any of the erratic behavior that Judge Gibbons observed. To the extent that Judge Gibbons is correct in his conclusion that it was the stress of the criminal case that caused her to decompensate, there is no evidence that the lesser stress of a civil proceeding has had – and it is to be hoped that it will not have – a similar effect.

This Court is fully aware of the obligation imposed by Rule 17(c) to "protect" an incompetent litigant. Should it become apparent, at any stage of the case, that Bender has become incompetent to protect her own interests, or should she behave in a way that demonstrates that she is incapable of handling the case without engaging in behavior that is adverse to her own interests and that no rational person would pursue, the Court stands ready to take whatever action is necessary. Equally, the Court is determined not to countenance improper or aggressive behavior from any litigant. At this stage, however, despite the concerns raised by the finding in the criminal matter, and without questioning the correctness of the ruling of the Criminal Court, having carefully considered the entire record before it, this Court does not find that Bender is "incapable of adequately prosecuting or defending [her] rights," N.Y. C.P.L.R.

21

1201, in the context of this civil proceeding, or generally lacks (outside the unique context of defending a criminal case) "the practical ability to manage . . . her own affairs," Hudnall, 800 F.2d at 385 (internal quotations omitted), such that it would become necessary or appropriate to deprive her of the valued right to "retain[ ] personal control over the litigation." Neilson, 199 F.3d at 651.

Accordingly, the Court does not find the plaintiff incompetent to proceed, and declines to appoint a guardian ad litem to represent plaintiff's interests in this matter.


SO ORDERED.

Dated: New York, New York
       June 22, 2009

                                        GERARD E. LYNCH
                                        United States District Judge


Copy to:

Sherry Bender
506 East 11th Street
Apt. #1A
New York, NY 10009